RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE _9 / 17/ 15_

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

b

DONALD W. HARGER,
    Plaintiff

VERSUS

CITY OF WEST MONROE, et al.,
    Defendants

CIVIL ACTION
NO. 3:14-CV-00976

MAGISTRATE JUDGE JAMES D. KIRK

MEMORANDUM RULING

Defendants filed a motion for summary judgment (Doc. 22) which is now ready for decision.

Procedural History

Before the court is a civil rights complaint filed pursuant to 28 U.S.C. § 1983 and Louisiana state law by plaintiff Donald W. Harger ("Harger") on May 13, 2014 (Doc. 1). The named defendants are the City of West Monroe, and Officers Justin Hattaway and Jody Ledoux (officers employed by the City of West Monroe Police Department) in both their official and individual capacities. Harger contends that on May 16, 2013, Officers Hattaway and Ledoux falsely arrested and falsely imprisoned Harger and used excessive force against Harger, resulting in injuries. Harger alleges

Section 1983 and state law claims for false arrest, false imprisonment, excessive force, assault, battery, intentional infliction of emotional distress, and negligence.  For relief, Harger asks for compensatory and punitive damages, attorney fees, and costs.

The parties agreed to try this case before the undersigned Magistrate Judge, and the District Judge signed an order (Doc. 11).

Defendants filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. rule 12(b)(6) (Doc. 3), which was granted in part and denied in part (Doc. 14).  Harger's Section 1983 claims against the City of West Monroe were dismissed, and his official capacity claims against Ledoux and Hattaway were dismissed, leaving the state law claims against the City of West Monroe and the Section 1983 and state law claims against Ledoux and Hattaway in their individual capacities.

Defendants then answered the complaint (Doc. 15) and filed a motion for summary judgment (Docs. 22, 24), to which Harger filed a response (Docs. 25, 26, 27), and defendants filed a reply (Doc. 28).

<u>Harger's Allegations</u>

Harger alleges that, on May 16, 2013, he and his wife were at their place of business, Interstate Batteries of Monroe ("Interstate") in West Monroe, Louisiana.  Harger alleges that his wife received a call from All Tune and Lube ("All Tune"), a car

2

repair shop in West Monroe, stating they had a warranty claim at their shop for one of Harger's Interstate car batteries, but explained that the customer had left her vehicle lights on overnight. Harger contends that, although his wife explained that probably was not a warranty replacement and All Tune just needed to recharge the battery, the All Tune employees appeared reluctant to do so (Doc. 1). Harger went to All Tune with a hydrometer to check the battery, spoke to the manager, listened to strong profanity directed at him by one of the employees, and decided to collect the eight batteries he had on consignment at All Tune-seven new batteries and one used battery (Docs. 1, 7). After Harger returned to his business with his batteries, Keith King, the manager at All Tune, called and said he thought Harger had taken one of their used batteries; Harger explained that, under the consignment contract with All Tune, he received the customer's old battery when one of his new batteries was put in the customer's vehicle (Docs. 1, 7).

Harger was on the phone with the All Tune manager, King, when the police arrived at Harger's business to retrieve the battery Harger had "stolen" (Doc. 1); when Harger tried to explain what had occurred, the officers began to give him a Miranda warning (Doc. 1). Harger then stated he would just return the used battery to All Tune and resolve the dispute in civil court. Harger got the used battery, but objected to the officers' order for him to return the battery to All Tune himself, since the employees there had been

3

so hostile (Docs. 1, 7).  The officers told Harger that he would return the used battery himself or be arrested, at which point Harger asked what he would be arrested for (Docs. 1, 7).

Officer Ledoux then told Harger to turn around, shoved him into a battery rack, and pulled out his taser (Docs. 1, 7).  When Harger's wife offered to take the battery back to All Tune, Officer Ledoux told her to shut up or she would be arrested (Doc. 1). Harger contends Officer Ledoux then ordered Harger to get on his knees and again pushed Harger into the battery rack (Docs. 1, 7). Harger stated in his deposition that he sustained bruising and pain in his shoulders for which he went to a physician and underwent physical therapy (Doc. 26, pp. 51-52/102).

Harger was arrested for theft, interfering with a police officer, and simple assault (Doc. 1).  Harger contends he had to bond himself out of jail, and that he received physical injuries which required medical treatment as a result of the battery committed on him by Officers Ledoux and Hattaway (Docs. 1, 7).

Harger contends that Officer Hattaway was the supervising officer and Officer Ledoux was the officer who shoved him into the battery rack (Doc. 7).  Harger contends that Officer Hattaway did not take any action to restrain or properly direct Officer Ledoux, and participated in the transport and booking process for Harger. Harger contends that Officer Ledoux has a prior history with another police department for physical misconduct, and that the

4

City of West Monroe was aware of, or should have been aware of,
that fact (Doc. 7).  Harger also alleges that all charges against
him were dropped by the City of West Monroe (Doc. 1).

<u>Law and Analysis</u>

<u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure mandates that
the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as
> to any material fact and the movant is entitled to
> judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "If a party fails to properly support an assertion of
> fact or fails to properly address another party's
> assertion of fact as required by Rule 56(c), the court
> may: (1) give an opportunity to properly support or
> address the fact; (2) consider the fact undisputed for
> purposes of the motion; (3) grant summary judgment if the
> motion and supporting materials-including the facts
> considered undisputed-show that the movant is entitled to
> it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all
material facts set forth in a statement of undisputed facts
submitted by the moving party will be deemed admitted for purposes
of a motion for summary judgment unless the opposing party
controverts those facts by filing a short and concise statement of
material facts as to which that party contends there exists a
genuine issue to be tried.

In this regard, the substantive law determines what facts are
"material."  A material fact issue exists if the evidence is such

5

that a reasonable jury could return a verdict for the nonmoving party.  However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff.  Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial.  In this analysis, we review the facts and draw all inferences most favorable to the nonmovant.  Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989).  However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment.  Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

Qualified Immunity

Defendants contend they are entitled to qualified immunity, against Harger's Section 1983 claims for false arrest/imprisonment and excessive force.

The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the

6

official violated a constitutional right that was clearly established at the time of the incident. Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800 (1996). Qualified immunity cloaks a police officer from personal liability for discretionary acts which do not violate well established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

> "The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law."

Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001), citing Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and, (2) if so, whether the defendant's

7

conduct was objectively unreasonable in light of the clearly established law at the time of the incident. Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards. Hare, 135 F.3d at 325. A constitutional right is clearly established if, in light of pre-existing law, the unlawfulness is apparent. Officials must observe general, well-developed legal principles. Doe v. Taylor Independent School Dist., 15 F.3d 443, 445 (5th Cir.), cert. den., 513 U.S. 815, 115 S.Ct. 70 (1994).

The second prong of the qualified immunity test is better understood as two separate inquiries: (1) whether the violated constitutional rights alleged to have been violated were clearly established at the time of the incident and, if so, (2) whether the conduct of the defendants was objectively unreasonable in the light of then clearly established law. Hare, 135 F.3d at 325-36. Objective reasonableness is a question of law for the court. The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits). For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident and, under

8

that standard (the minimum standard not to be deliberately indifferent), the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable. Hare, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct. Douthit v. Jones, 619 F.2d 527, 533 (5th Cir. 1980). A party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. Id.

### 1. False Arrest Claim

Harger contends he was falsely arrested for theft, interfering with officers, and assault on an officer.

The Law

The constitutional torts of false arrest and false imprisonment require a showing that there was no probable cause. Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001), cert. den., 122 S.Ct. 46 (U.S. 2001). An officer has probable cause to arrest if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime. See Gladden v. Roach, 864 F.2d

9

1196, 1199 (5th Cir.), cert. den., 491 U.S. 907, 109 S.Ct. 3192 (1989).  Also, <u>Hunter v. Bryant</u>, 502 U.S. 224, 228, 112 S.Ct. 534 (1991).  If probable cause for an arrest even arguably existed, immunity cannot be lost.  <u>Brown</u>, 243 F.3d at 190.

The right to be free from arrest without probable cause is a constitutional right that was clearly established in 2013.  See <u>Beck v. Ohio</u>, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964) (the right to be free from arrest without probable cause is a clearly established constitutional right).

An officer has probable cause to arrest if, *at the time of the arrest*, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime.  <u>Gladden</u>, 864 F.2d at 1199.  Also, <u>Hunter v. Bryant</u>, 502 U.S. 224, 228, 112 S.Ct. 534 (1991); <u>Haggerty v. Texas Southern University</u>, 391 F.3d 653, 655-56 (5th Cir. 2004). Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed an offense.  <u>Haggerty</u>, 391 F.3d at 655-56. If probable cause for an arrest even arguably existed, immunity cannot be lost.  <u>Brown</u>, 243 F.3d at 190.

The elements of the crime of theft (La.-R.S. 14:67) are (1) that there be a misappropriation or taking, (2) that the misappropriation or taking be of a thing of value, (3) that the

thing belong to another, and (4) that the misappropriation or taking be with the intent to deprive the other permanently of that which is the subject of the taking.  The elements of the crime of attempted theft include the specific intent to commit the crime of theft and an act tending directly toward the accomplishment of the theft.  State v. Pittman, 368 So.2d 708, 710 (La. 1979).

Harger contends Hattaway is also liable to him because he failed to intervene and prevent Ledoux from violating his constitutional rights; instead, Hattaway pointed his taser at Harger while Ledoux arrested him.  The Fifth Circuit has held that law enforcement officers are obligated to prevent fellow officers from violating a citizen's constitutional rights.  Ware v. Reed, 709 F.2d 345, 353 (5th Cir. 1983).  See also, Lewis v. Goodie, 798 F.Supp. 382, 389 (W.D. La. 1992); Thomas v. Frederick, 766 F.Supp. 540, 555 (W.D.La. 1991).  Police officers have an affirmative duty to enforce the law, and are obliged to prevent fellow officers from violating a citizen's constitutional rights. Where an officer fails to do so, the observing officer is jointly liable to the victim under Section 1983.  Lewis, 798 F.Supp. at 390.

The Evidence

Corporal Hattaway states in his affidavit (Doc. 22, Ex. 3) that, at the time of the incident, he was "field training" Officer Ledoux, who was newly hired (Doc. 22, Ex. 3).  Hattaway states in his affidavit that they had been called to investigate a complaint

11

of a disturbance and possible theft at All Tune & Lube in West Monroe (Doc. 22, Ex. 3).  Hattaway states they spoke to the All Tune manager, Keith King, and another unnamed employee, who told the officers that All Tune did business with Interstate Batteries of West Monroe, which is owned by Donald Harger, and that Interstate had batteries located at All Tune for sale to the general public (Doc. 22, Ex. 3).  Hattaway states in his affidavit that he was told that Harger was called earlier that morning by an All Tune employee concerning an allegedly defective Interstate battery that had been purchased by an All Tune customer, Kendra Turner, one to two weeks prior; both Turner's vehicle and her battery were at All Tune at that time (Doc. 22, Ex. 3).

Officer Ledoux did not provide an affidavit, but his arrest report states that All Tune manager Keith King stated that Harger took a customer's battery in response to a separate argument he was having with King over a contractual agreement (Doc. 26, p. 98/102).

Cherri Harger, Harger's wife and an Interstate employee, states in her affidavit (Doc. 26) that she spoke to the All Tune employee when he called claiming the battery was defective, but was told that Turner had left her car lights on all night, so Cherri Harger told the employee the battery probably only needed to be recharged, but that it was still under warranty and would be replaced free if it proved to be defective (Doc. 26, pp. 66-67/102).  Cherri Harger states in her affidavit that the All Tune

employee told her he would "put it on charge," to re-charge the battery (Doc. 26, p. 67/102). Cherri Harger further states in her affidavit that Harger decided to go to All Tune with a hydrometer to show the All Tune employee how to check a battery (Doc. 27, p. 7/34).

Hattaway states in his affidavit that he was told Harger appeared at All Tune shortly thereafter and became involved in a verbal altercation with an All Tune employee concerning Turner's battery and other things (Doc. 22, Ex. 3).

Harger states in his deposition that he had a contractual arrangement to provide All Tune with Interstate batteries on commission, and had a rack set up at All Tune with eight new Interstate batteries on it; Harger was All Tune's only Interstate battery provider (Doc. 26, pp. 53-54/102). Harger and his wife, Cherri, both stated in their depositions that the arrangement included the provision that, if All Tune sold one of the new Interstate batteries and got a used battery in return, then All Tune would give Harger the used battery, which he would sell for recycling (Doc. 26, pp. 55-56, 89/102). Harger states in his affidavit that, when he arrived at All Tune, one of the All Tune employees was verbally abusive and so offensive that Harger decided to remove his business from All Tune; Harger states that he took his battery rack and eight Interstate batteries, seven of which were new and on the rack and a used one sitting on the ground (Doc.

13

26, p. 55/102).   Cherri Harger stated in her deposition that All Tune had eight Interstate batteries on consignment and Harger took eight batteries from All Tune, including the used battery, which was also an Interstate battery (Doc. 26, p. 90/102).   Harger testified in his deposition that the All Tune employees had taken one of his new Interstate batteries off his rack and put it in Turner's car as a "warranty replacement" at no charge, and put her old Interstate battery on the floor near Harger's display rack (Doc. 26, p. 56/201).

Harger testified in his deposition that his contract with All Tune stated that Harger could pick up his batteries and rack at any time (Doc. 26, p. 55/102), and that if any of the eight batteries were not there, All Tune had to supply Interstate with a used battery, a core battery, or eighteen dollars (Doc. 26, p. 55/102).

Cherri Harger testified in her deposition that Harger called her to ask about their Interstate inventory at All Tune, and told her that things were "getting real ugly" at All Tune and the guys there were being a little rude to him, so Harger was going to get his batteries and get out of there (Doc. 26, p. 68/102).   Cherri Harger further testified in her deposition that Keith King called later and said he thought Harger might have picked up one of their batteries, and Cherri told him she would give Harger the message when he returned (Doc. 26, pp. 68-69/102).

Cherri testified that, when Harger returned to their store,

14

she told him that Keith King had called and said he thought Harger had one of his used batteries, and Harger said he would call King right away; Cherri then heard Harger talking to King in his office (Doc. 26, p. 69/102).    Cherri testified that she heard Harger telling King that he had eight Interstate batteries, and that is how many Harger picked up (Doc. 26, p. 69/102).    Cherri testified that was when the police car pulled up and Officer Jody Ledoux walked in and said, "We're looking for Don" (Doc. 26, p. 71/102). Cherri testified that, when she told him that Harger was on the phone, Ledoux said, "It sounds like he's talking to the customer we're here about" (Doc. 26, pp. 73-74/102).

Cherri testified that Ledoux then asked her to look and see if the batteries were in the van and she did, and when she returned both officers had entered Harger's office although he was still on the telephone with Keith King (Doc. 26, p. 76/102).    Cherri testified that she next heard Harger hang up, then the officer said something like "I'm here to pick up that battery you took," Harger said "Nobody's getting nothing without cutting me a check," then the officer yelled "Sit down" twice and read Harger his rights (Doc. 26, p. 76/102).    Cherri testified that she got up and went to stand behind the Officer Hattaway, who was in Harger's office doorway (Doc. 26, pp. 77-78); she told Harger to just give them the battery and she would take the matter to civil court (Doc. 26, p. 78/102).

15

Cherri testified that Harger got up and walked to the warehouse, Ledoux followed Harger, Cherri followed them, and Hattaway was behind her (Doc. 26, pp. 78-79/102). Cherri testified that she and Harger walked to the van, she told Harger to just give the battery to the officers, Harger took the battery out of the van and put it on the ground, Harger turned to walk away, and Ledoux told Harger he was going to have to take the battery back to All Tune (Doc. 26, p. 80/102). Cherri testified that she responded to Ledoux, saying that Harger as not going to return to All Tune because there had already been a confrontation there, and Harger simultaneously said he would not take it but his wife would (Doc. 26, p. 82/102). Cherri testified that Ledoux then asked Harger if he was "not going to take that battery back down there" and Harger replied no, and put his right arm up and pointed at Cherri, saying "she'll take it" (Doc. 26, pp. 82-83/102).

Cherri testified that Ledoux then told Harger to turn around and as Harger readied to turn around, Ledoux grabbed Harger, shoved him into the battery rack, both officers pulled out their tasers, and Cherri yelled that it had all gone too far; Ledoux had not yet told Harger he was under arrest (Doc. 26, pp. 82-83, 85/102). Cherri testified that Harger went face-first into the rack and lost his glasses (Doc. 26, pp. 89-102). Cherri testified that Ledoux then backed away, and Harger had his back to the officers when they pulled out their tasers, and Hattaway told Harger to get on his

16

knees or he would "light him up" (Doc. 26, pp. 85-86/102). Cherri also testified in her deposition that, after the officers had pulled out their tasers, she told Ledoux that she would take the battery to All Tune because, if Harger went to All Tune, there would be a confrontation; Ledoux then told Cherri she was about to get arrested, and she asked "for what?" (Doc. 26, pp. 85-86/102). Cherri testified that Harger then placed his hands behind his back to be cuffed and Ledoux shoved Harger into the battery rack a second time, at which point CHerri said she was going to call their attorney (Doc. 26, pp. 87-88/102). Essentially, Cherri Harger testified that Ledoux shoved Harger into a battery rack twice, that Harger was not resisting arrest or attempting to hit Ledoux, and that Harger pointed at Cherri at one point.

Hattaway states in his affidavit that he was told there was a disagreement over the contractual arrangements between All Tune and Interstate (Doc. 22, Ex. 3). Hattaway states that he was told that, following the verbal altercation with the All Tune employee, Harger removed eight auto batteries from All Tune which Harger claims belonged to him; however, one of the batteries Harger removed had previously been purchased by Turner, and an unnamed All Tune employee told Harger that one of the batteries he was taking was Turner's battery and did not belong to him (Doc. 22, Ex. 3). Hattaway further states in his affidavit that he was told that, despite having been told the used battery belonged to Turner,

17

Harger removed it from the All Tune premises (Doc. 22, Ex. 3).
Hattaway states in his affidavit that, based on what they were told
at All Tune, he and Officer Ledoux had probable cause to believe
that Harger had committed a theft (Doc. 22, Ex. 3).  Hattaway
states that, *when he and Ledoux arrived at Interstate*, they had
probable cause to believe Harger had committed a theft, and that
Harger admitted he removed the battery from All Tune (Doc. 22, Ex.
3).

Hattaway does not recount in his affidavit what he was told by
Cherri Harger (Doc. 22, Ex. 3).  Hattaway states in his affidavit
that Ledoux was the lead officer and the arresting officer, that
Ledoux arrested Harger, and that he believes Ledoux had probable
cause to arrest Harger (Doc. 22, Ex. 3).

Officer LeDoux appears to have based the arrest on the
statement of the All Tune employees that, when Harger took his
eight Interstate brand batteries and battery rack from their shop,
he took an Interstate brand battery that belonged to Turner and did
not belong to Harger.

There is no affidavit or deposition from Ledoux, but Ledoux
wrote a police report on the incident (Doc. 26, p. 99/102).  Ledoux
states in his police report that he contacted Harger at his
business and attempted to explain the battery belonged to a
customer and not to All Tune, so the battery could not be taken as
part of a contractual disagreement (Doc. 26, p. 99/102).  Ledoux

states in his report that Harger refused to return the battery even after Ledoux told him had taken it illegally, then Harger "became verbally combative," so Ledoux read him his rights (Doc. 26, p. 99/102). Ledoux states in his report that he gave Harger the opportunity to return the battery to avoid being arrested, but that Harger only went to his van, placed the battery on the ground and attempted to walk back inside the store; Ledoux then informed Harger that he had to physically return the battery to the customer, to which Harger responded he would not do that and continued walking away (Doc. 26, p. 98/102). Ledoux states he told Harger to stop, and Harger responded by trying to face Ledoux and "taking an aggressive stance" while "glaring" at Ledoux, Ledoux then attempted to take hold of Harger's right arm but Harger snatched his arm away and raised his closed fist to Ledoux in an attempt to strike Ledoux in the face (Doc. 26, pp. 98-99/102). Ledoux then placed Harger against a rack, turned him around to control him, and told him he would be tasered if he did not comply; Harger placed his hands behind his back, but attempted to snatch them away again when Ledoux grabbed them so Ledoux placed Harger against the rack a second time to control him and was able to cuff him and take him into custody (Doc. 26, p. 99/102).

On the audio recording from the police vehicle, Cherri Harger can be heard explaining the consignment arrangement and that the All Tune employee did not understand the consignment arrangement.

19

The audio recording shows that Harger told the officer that he would return the battery when the All Tune employee produced the paperwork, to which Ledoux responded that the battery belonged to an All Tune customer and not Harger, that Harger had committed theft, and needed to return the battery immediately (Docs. 22 & 24, Ex. 4). The police vehicle audio recording also shows that, when Harger tried to explain that all eight Interstate batteries were his, Ledoux accused Harger of theft, read him his rights, and ordered him to return the battery to the customer or be arrested (Doc. 22/24, Ex. 4). Ledoux then told Harger he had ten seconds to figure it out, Ledoux ordered Harger to return it again to which Harger could be heard saying "no", Ledoux then yelled at Harger to turn around three times in quick succession while Harger was saying something else, and a clearly audible scuffle ensued (Docs. 22/24, Ex.4). Cherri could be heard trying to tell Ledoux that if Harger went there would be a confrontation, and Ledoux told her he was about to arrest her, also (Docs. 22/24, Ex. 4). Ledoux yelled at Harger to *not* turn around and there was more scuffling (Docs. 22/24, Ex. 4).

After they put Harger into the police car, Ledoux can be heard explaining to Hattaway that Harger had refused to return the battery, Ledoux told him he was not going to return it for him, and Harger tried to walk away from Ledoux and go back into his store; Cherri's offer to return the battery was not mentioned (Docs.

20

22/24, Ex. 4).  The officers are then heard whispering on the DVD in discussion about what they were going to call the arrest, settling on "white male ten fifteen" (Docs. 22/24, Ex. 4).[1]

A video of the incident was recorded by a security camera at Harger's business.  The video submitted by Harger shows that Harger never attempted to hit Ledoux but only pointed toward his wife. Then Ledoux grabbed Harger, shoved him into the battery rack, and leaned on him, and Harger appeared to hold his forearms and hands in front of himself in a defensive manner; Hattaway then moved into view and can be seen pointing a taser or some other weapon at Harger (Doc. 22/24, Exs. 6, 7).  When Ledoux released Harger, Harger stepped away from Ledoux and the rack while Ledoux pulled and pointed a weapon or taser at Harger, then Harger turned around and placed his arms behind his back for cuffing.  Ledoux placed his weapon back into his belt and started to handcuff Harger, but when Harger turned partially, Ledoux grabbed Harger, shoved him into the battery rack again, and leaned against him while he finished cuffing him; Hattaway kept his weapon pointed at Harger (Doc. 22/24, Video 7).

Harger was charged with interfering with Officers Ledoux and Hattaway (Doc. 26, p. 100/102), simple assault (Doc. 26, p. 101/102), and theft of an automobile battery valued at less than

---

[1] The police code 10-15 is ordinarily used to mean "prisoner in custody."

21

$300 (Doc. 26, p. 102/102).

Analysis

A. False Arrest for Theft

Defendants argue there was probable cause to arrest Harger for theft of the battery and, therefore, they are entitled to dismissal of the Section 1983 and state law claims of false arrest.

The police, apparently accepting the complaint of the battery theft as a proven fact, went to Harger's place of business, accused him of theft of the battery, and insisted that Harger personally return the battery immediately. Harger contends he explained that he preferred not to take the battery back to All Tune himself because the situation at the repair shop had become ugly, so his wife would return it, but Officer Ledoux ordered Harger to return it himself or be arrested.

It is not explained why Officer Ledoux insisted on trying to force Harger to return the battery personally, which likely would have created another volatile confrontation between Harger and the auto repair shop personnel, instead of allowing Harger's wife to return it. If Officer Ledoux was simply trying to get the battery back to All Tune, he would have allowed Harger's wife to return it. It was inappropriate and unreasonable for Officer Ledoux to order Harger to return the battery to All Tune personally.

It is also not explained why the officers did not treat the situation as a contractual dispute between two businesses rather

22

than a theft, since Hattaway admits in his affidavit that he knew there was a contractual dispute as soon as he spoke to the All Tune employees and Ledoux's report shows he did as well.  There is no evidence that Harger intended to steal a third person's used car battery.  The officers were aware of the contract dispute and it is clear that the officer knew Harger claimed the battery was his, and it appears that the battery was, in fact, his.[2]

It is pertinent to the issue of intent, and the information the officers had before they arrested Harger, that no one has disputed that Harger had eight Interstate batteries at the repair shop, or contended that he took more than eight batteries with him. Moreover, Corporal Hattaway was careful to state that there was probable cause to believe Harger had committed a theft *when they arrived at Interstate;* he did not say they had probable cause to arrest Harger at the time of the arrest, after they had spoken to him and his wife.

Although Hattaway describes in detail what he was told by the All Tune manager and an unnamed employee, he *does not* set forth what he was told by Cherri Harger, what Harger told Officer Ledoux,

---

[2] It appears that, contrary to Cherri's instructions, the All Tune employees took one of his new batteries off Harger's rack and put it in Turner's car as a "warranty replacement" at no charge, put her old Interstate battery on the floor near his Harger's display rack (Doc. 26, p. 56/201), and Harger picked it up.  Therefore, Harger took the used battery which was removed from the car when the new Interstate battery was put in, in accordance with the consignment contract; the used battery no longer belonged to Turner.

23

or what occurred in the Interstate building between Ledoux and Harger.

Ledoux's police report does not comport with the version of events recorded in audio by Ledoux's vehicle DVD recorder or Harger's business video of the event.

Ledoux's report states, incorrectly, that Harger refused to return the battery.  Ledoux states in his report that he told Harger that he had to return the battery himself, and that he arrested Harger for refusing to return the battery.  Ledoux did not state in his report that Harger said he was trying to avoid another confrontation with the All Tune employees, was willing to have his wife return the battery, or that Cherri Harger stated that she would return the battery.  Ledoux's report also does not state that Harger took the battery because he believed it was his (which it apparently was), or indicate why Ledoux believed the All Tune employees and not Harger.  Ledoux's report also states that, when he attempted to take hold of Harger's right arm, Harger raised his closed fist to Ledoux in an attempt to strike Ledoux in the face, but the video clearly shows Harger pointing and not raising his fist.  The incident clearly involves a dispute over which interstate batteries belonged to Harger and which did not, rather than a theft, which is likely why all of the criminal charges against Harger were dropped.

While it is recognized that police officers are not attorneys,

24

and that the value of hindsight cannot be over-estimated, both officers knew there was a contract dispute going on between Harger and the All Tune employees as soon as they spoke to All Tune, and the officers were in possession of evidence that indicated that a theft had not taken place.  When the officers spoke to Cherri Harger, they knew Harger had eight batteries at All Tune and that he took eight batteries back.  Since Harger believed he had picked up his own battery, he did not have the specific intent to permanently deprive another of the battery.

Reasonable officers would have recognized there was a possibility that someone had made a mistake and there was no probable cause to believe a theft had occurred.  Although Hattaway explained in his affidavit that Ledoux had arrested Harger and that he was just training Ledoux, Hattaway was present during the arrest and, as Ledoux's trainer, could have intervened.  Instead, Hattaway did not stop the arrest or the apparent mistreatment of Harger, and even participated by pulling out his taser in a situation that did not warrant that degree of force.  The police were not dealing with some street thug whom they had just disarmed, for example; rather, they were dealing with a business owner who had confirmed what the officers already knew - that this was a contract dispute.

It was clear to the officers as soon as they spoke to the All Tune employees that the parties had a contractual relationship and that the dispute arose out of that contractual relationship.  Once

they spoke to Harger and his wife, that fact was confirmed. The officers did not have probable cause to arrest Harger. The officers' actions in arresting Harger for theft were objectively unreasonable and they are not entitled to qualified immunity for falsely arresting Harger for theft.

Therefore, defendants are not entitled to qualified immunity, defendants' motion for summary judgment will be denied on the issue of whether they falsely arrested Harger for theft, and summary judgment will be entered in favor of Harger.

### B. False Arrest for Assault

Harger was also charged with assaulting Ledoux. Harger contends defendants did not have probable cause to arrest him for assault. Defendants only argue in brief that they had probable cause to arrest Harger for theft, and do not argue there was probable cause to arrest him for assault and for interfering with an officer.

Ledoux's report states that Harger faced Ledoux with "an aggressive stance (feet slightly more than shoulder width apart, knees slightly bent, body tense with closed fists) while glaring at [Ledoux]" (Doc. 26, pp. 98-99/102). Ledoux's report states that, after Harger allegedly took an "aggressive stance," Ledoux tried to "take hold" of Harger's right arm and Harger, in one motion, snatched it from Ledoux's grasp and raised his closed fist to Ledoux in an attempt to strike Ledoux in the face, at which point,

26

Ledoux "placed Harger against a rack and turned him around" (Doc. 26, p. 99/102). The video of the incident does not show Harger in an aggressive stance and his hands were not in fists (Doc. 22, Exs. 5, 6). The video clearly shows Harger quickly pointing toward his wife, not raising a fist and attempting to strike Ledoux, then Ledoux grabbed him and shoved him into the rack. Both of Harger's arms came up in what appears to be a defensive posture (Doc. 22, Exs. 5, 6).[3] Cherri's testimony is consistent with the video. Therefore, defendants did not have probable cause to arrest Harger for assault.

Since there is no genuine issue of material fact as to whether Harger attempted to strike Ledoux, defendants are not entitled to qualified immunity, defendants' motion for summary judgment will be denied on the issue of whether there was probable cause to arrest Harger for assaulting an officer, and summary judgment will be granted in favor of Harger on this issue.

### C. False Arrest for Interfering With an Officer

Finally, Harger was charged with interfering with an officer in violation of West Monroe City Ordinance 11-4015.2[4] (Doc. 22).

---

[3] This was the first time Ledoux "placed" Harger against the rack and is the only part of the altercation where Ledoux claims, in his report, that Harger tried to strike him.

[4] The West Monroe City Ordinance states: "Sec. 11-4015.2-Interfering with an officer: (a) It shall be unlawful for any person to intentionally delay or obstruct any law enforcement officer acting in his official capacity while such law enforcement officer is engaged in any investigation, arrest,

Apparently Harger was charged with interfering with the officers' arrest of himself.    Interfering with one's own arrest is essentially resisting arrest.  See State v. Smith, 352 So.2d 216, 218-219 (La. 1977).  Defendants have not presented an argument as to whether there was probable cause to arrest Harger for interfering with an officer; defendants only argue the officers had probable cause to arrest Harger for theft.

It is a long-established principle in Louisiana law that a citizen has the right to resist an unlawful arrest.  LaMartina-Howell v. St. Tammany Parish School Bd., 2010 WL 1838638, *2 n.3 (E.D.La. 2010), citing La.R.S. 14:108(A); State v. Lindsay, 388 So.2d 781, 782 (La. 1980); State v. Washington, 98-545 (La. App. 5th Cir. 12/16/1998), 725 So.2d 587, 590.

Since defendants did not have probable cause to arrest Harger for theft or assault, he could have lawfully resisted being arrested.  Regardless, the video shows that Harger did not resist arrest.    Defendants are not entitled to qualified immunity, defendants' motion for summary judgment will be denied on the issue of whether there was probable cause to arrest Harger for interfering with an officer, and Harger is entitled to a summary

seizure or property or service of process.  (b) For purposes of this section, obstruction shall mean and include, but not be limited to, any action giving rise to a disruption or distraction of the law enforcement officer."  This ordinance broadens the criminal statue of resisting an officer, La.R.S. 14:108, by including interfering with an "investigation" in the definition of resisting an officer.

judgment in his favor on this issue, as well.

### 2. Excessive Force Claim

Harger also contends defendants are liable to him for use of excessive force, and defendants claim they have qualified immunity.

The Law

The use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Saucier v. Katz, 533 U.S. 194, 201-202, 121 S.Ct. 2151, 2156 (2001)(overruled on other grounds in Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808 (2009); Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865 (1989). To state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was (3) objectively unreasonable. Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996).

In a Section 1983 claim, in gauging the objective reasonableness of the force used by a law enforcement officer, the court must balance the amount of force used against the need for that force. Ikerd, 101 F.3d at 433-34. The amount of force that is constitutionally permissible, therefore, must be judged by the context in which that force is deployed. Ikerd, 101 F.3d at 434.

In Graham, the Supreme Court set forth a list of factors relevant to the merits of a constitutional excessive force claim,

requiring careful attention to the facts and circumstances of each particular case including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  If an officer reasonably, but mistakenly, believes that a suspect is likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.  Saucier, 533 U.S. at 204-205, 121 S.Ct. at 2158.

Although the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, the permissible degree of force depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee.  Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008).  The law was clearly established and thus the defendants should have known that when one is not resisting arrest, attempting to escape, or otherwise posing a threat at the time of the alleged use of force, threatening a detainee with tasers, shoving him into a battery rack, and then shoving him into the battery rack a second time, allegedly causing injuries-all because of an $18 battery core, constitutes an excessive use of force.  See Curran v. Aleshire, 67 F.Supp.3d 741, 753 (E.D.La. 2014), appeal filed (5th Cir. 1/14/15).

30

A plaintiff asserting an excessive force claim pursuant to Section 1983 is also required to show he suffered at least some form of injury.  The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed.  <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 314 (5th Cir. 2001); <u>Williams v. Bramer</u>, 180 F.3d 699, 703-704 (5th Cir.), clarified on rehearing, 186 F.3d 633 (5th Cir. 1999)

Defendants argue the Harger was "very intimidating" at 6' tall and 285 pounds.  However, in the video, Officer Ledoux appears to be close to Harger in size and does not appear to have had any difficulty shoving Harger into the battery rack.

Harger alleges he suffered bruising and pain as a result of being shoved into the battery rack twice, and required physical therapy, but it is noted that Harger has not submitted his medical records or any pictures to prove he sustained injuries that were more than de minimis.  Evidence as to the extent of Harger's injuries would be indicative of the degree of force used and is required in order to meet the "more than de minimis injury" threshold.  At the summary judgment stage, the court requires evidence—not absolute proof, but not mere allegations either.  <u>Ontiveros v. City of Rosenberg, Tex.</u>, 564 F.3d 379, (5th Cir. 2009), citing <u>Reese v. Anderson</u>, 926 F.2d 494, 499 (5th Cir. 1991).  However, defendants appear to be satisfied with Harger's assertions of injury and treatment, as they have not raised and argued the

31

issue in their motion.  Therefore, defendants' motion for summary judgment will be denied as to Harger's Section 1983 claims of excessive force.

Hattaway also claims defendants are liable to him for use of excessive force under Louisiana state law.  Under Louisiana law, the use of force when necessary to make an arrest is a legitimate police function, but unreasonable or excessive force is a breach of an officer's duty.  Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977).  Even in a situation where the arrest is lawful, a police officer may only use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.  Whether or not a police officer has used unreasonable or excessive force is determined according to the facts and circumstances of the case and various factors including the risks and dangers faced by officers, the nature of the offense involved, the existence of alternative methods of arrest and the physical size and strength of the officers as compared to that of the arrestee.  McDaniel v. Green, 99-1087 (La.App. 3 Cir. 12/22/99), 755 So.2d 942, 948-949, writ den., 2000-0200 (La. 3/24/00), 758 So.2d 151, citing Stroik v. Ponseti, 96-2897 (La.9/9/97), 699 So.2d 1072, and Kyle v. City of New Orleans, 353 So.2d 969 (La.1977).  Also, Westmoreland v. City of Natchitoches, 2000-00320 (La.App. 3 Cir. 10/4/00), 771 So.2d 715, 718.  The use of unreasonable or excessive force renders the

officer and his employer liable for injuries which may result. <u>Picou v. Terrebonne Parish Sheriff's Office Through Rozands</u>, 343 So.2d 306, 308 (La. App. 1st Cir. 1977), writ den., 345 So.2d 506 (La. 1977), and cases cited therein; La.C.C. art. 2320.

For the same reasons as given for the Section 1983 claim, the undersigned finds that Harger has not yet proven that he suffered injuries as a result of the use of force by defendants.

There are genuine issues of material fact as to whether Harger suffered an injury.   Therefore,  there  are  genuine  issues  of material  fact  on  the  issue  of  excessive  force  which  preclude  a summary judgment and defendants' motion for summary judgment (Doc. 22) is denied on this issue.

### 3. City of West Monroe

Harger  also  named  the  City  of  West  Monroe  as  a  defendant. Harger's Section 1983 claims against the City were dismissed (Doc. 14),  leaving  only  Harger's  state  law  claims.   Harger  alleges  that the City of West Monroe is liable to him for his injuries because it employed Ledoux and Hattaway.  Defendants simply state in their brief (Doc. 22) that "the City of West Monroe is not liable under a theory of respondeat superior."

Louisiana  state  law  imposes  vicarious  liability  on  a municipality for the excessive use of force by a police officer in effecting  an  arrest.   <u>Lewis  v.  Goodie</u>,  798  F.Supp.  382,  391 (W.D.La. 1992), citing <u>Braud v. Painter</u>, 730 F.Supp. 1, 9 (M.D.La.

33

1990); La.C.C. art. 2320; <u>Lamkin v. Brooks</u>, 498 So.2d 1068 (La. 1986); <u>Cheatham v. City of New Orleans</u>, 378 So. 2d 369, 375 n.7 (La. 1979).   State law also imposes vicarious liability on an employer for damages sustained as a result of a false arrest. La.C.C. art. 2320, <u>Sullivan v. Quick</u>, 406 So.2d 284 (La. App. 3d Cir. 1981).

Since the City of West Monroe is vicariously liable to Harger under state law for violations of Harger's rights by Officer Ledoux and Officer Hattaway, defendants' motion for summary judgment is denied as to Harger's state law claims against the City of West Monroe.

Conclusion

Based on the foregoing discussion, IT IS ORDERED that defendants' motion for summary judgment (Doc. 22) is DENIED as to Harger's state law claims against the City of West Monroe.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Doc. 22) is DENIED as to Harger's Section 1983 claim for excessive force and related state law claims against defendants Ledoux and Hattaway.[5]

On Harger's **false arrest** claims only, IT IS ORDERED that SUMMARY JUDGMENT IS ENTERED IN FAVOR OF HARGER and AGAINST LEDOUX AND HATTAWAY on Harger's Section 1983 claim of false arrest, and

---

[5] The only liability issue remaining to be tried on the excessive force claim is whether, and the extent to which, Harger was injured.

34

that SUMMARY JUDGMENT IS ENTERED IN FAVOR OF HARGER and AGAINST LEDOUX, HATTAWAY AND THE CITY OF WEST MONROE on Harger's state law claim of false arrest, finding Harger was falsely arrested for theft, interfering with an officer, and assault.[6]

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 17th day of September 2015.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

---

[6] Because discovery is complete on the issues presented here, defendants have presumably submitted all of the evidence they have relative to the claims, and the issues have been fully briefed, providing further notice would serve no purpose. See Fed.R.Civ.P. rule 56(f). In any event, in the unlikely event defendants wish to submit additional summary judgment evidence, it can be submitted by way of a motion for reconsideration within ten (10) days of this Ruling.